# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

|                                                          |   |                              |
|----------------------------------------------------------|---|------------------------------|
| **S.D., individually as parent and legal guardian of HV, a minor,** | ) |                              |
|                                                          | ) |                              |
| **Plaintiff,**                                           | ) |                              |
|                                                          | ) |                              |
| **v.**                                                   | ) | **Case No. 2:13-cv-00152-JDL** |
|                                                          | ) |                              |
| **PORTLAND PUBLIC SCHOOLS,**                             | ) |                              |
|                                                          | ) |                              |
| **Defendant.**                                           | ) |                              |

## ORDER ON PLAINTIFF'S APPEAL OF
## THE ADMINISTRATIVE HEARING OFFICER'S DECISION

This action is before the court on the complaint filed by the plaintiff, SD, who requests that the court vacate an administrative hearing officer's decision under the administrative procedures of the Individuals with Disabilities in Education Act ("IDEA" or "the Act"), 20 U.S.C. § 1415(i)(2). For the reasons stated below, I find that the administrative hearing officer's decision should be **AFFIRMED IN PART** and **VACATED IN PART**.

## I. FACTUAL BACKGROUND

SD brings this appeal on behalf of her 14 year-old son, HV. Plaintiff's Brief, ECF No. 22 at 1. In March 2008, HV was diagnosed with a variety of reading and anxiety disorders which required a "structured and systematic multi-modal reading approach that focuses on phonics." Administrative Record at 2536. HV's diagnosing psychologist, Sharon Etzweiler, Ph.D., recommended the Orton-Gillingham program or the Wilson Reading Program ("Wilson") to address HV's reading difficulties. *Id.*

Shortly after HV's diagnosis, the Portland Public Schools ("Portland" or "the School District") found HV to be eligible for IDEA services under the category of "specific learning disability" and held an individualized education plan ("IEP") team meeting at which it was decided that HV would receive five hours per week of one-on-one (1:1) or one-on-two (1:2) instruction in reading and writing. ECF 22 at 2; R. at 2537. Accordingly, HV received reading instruction in the Wilson program through the end of his second grade year (2007-2008) and throughout his third grade (2008-2009) and fourth grade years (2009-2010) from Cynthia Johnson, a Wilson-certified special education teacher. R. 2537-38. HV also received extended school year tutoring in the Wilson program during the summer breaks between school years. *Id.*

A.   **Fifth Grade (2010-2011)**

In May 2010, HV's IEP team met for its annual review and drafted HV's fifth grade IEP to require "specially designed instruction 5 hours weekly to address reading or writing" to be conducted in a small group or individual setting. R. 1127.

The IEP team reconvened in November 2010 to address SD's concerns about how HV's Wilson instruction was being administered. R. 679-688. Although the Wilson program required 100% accuracy on a given level in order to progress to the next level, Johnson admitted that she sometimes allowed HV to progress to the next level if he exhibited 90% accuracy in order to keep him motivated. R. 2540-41. SD objected to Johnson's approach, and asked that she administer the Wilson program without skipping any steps, which Johnson agreed to do. *Id.* at 2541. Later the same month, Jane Boulos, a Portland school psychologist, conducted HV's triennial

reevaluation and found that he had significant deficits in word reading, reading fluency, and reading comprehension. ECF No. 22 at 5. The IEP team reconvened again in January 2011 in order to hear Boulos present the results of her evaluation and agreed that the IEP should continue to require "5 hours per week of special, multi-sensory instruction in reading and spelling." R. 1045; R. 2544.

## B.     Sixth Grade (2011-2012)

In June 2011, the IEP team met for its annual review and to plan HV's transition from elementary to middle school. R. 2544; ECF No. 22 at 6. Johnson reported to the team that HV was working on level 7 of the Wilson program, and that he was doing "quite well." *Id.* The team agreed that HV's sixth grade IEP should require five 50-minute sessions per week of individual, multisensory instruction in reading and writing; three 50-minute sessions per week of special education support to help HV complete classroom assignments; and extended school year services consisting of six hours per week for five weeks during the upcoming summer. R. 1034.

HV began attending the sixth grade at Lincoln Middle School ("Lincoln") in September 2011. ECF No. 22 at 6. Almost immediately, a scheduling conflict arose between HV's participation in band and his 50-minute 1:1 reading instruction, which SD and school officials resolved by reducing the reading instruction to one 50-minute session every other day. R. 275-278; R. 2546. They agreed to reevaluate HV's reading progress in four to six weeks to ensure that the reduced amount of 1:1 instruction was not affecting his reading progress. *Id.* At approximately the same time, HV's new Wilson-certified instructor, Maryanne Scally, reviewed HV's files and decided to re-

test him in the Wilson program, identifying what she characterized as "some holes in his knowledge" which caused her to return HV to Wilson level 2. R. 2546-47. SD testified that she only learned of this setback "a couple of months into the school year" and that she learned of it from HV rather than from a teacher or other school official.[1] R. 2630.

After meeting with HV's teachers in late October 2011, SD decided to have HV drop band and take private music lessons in order to allow him to devote more time to his 1:1 reading instruction. R. 2547. Yet rather than return to five 50-minute sessions per week, the school scheduled HV for four 50-minute sessions per week. *Id.*

Through the end of 2011 and into January 2012, HV experienced a number of bullying incidents which caused him to suffer increased school-related anxiety. ECF No. 22 at 7. For example, in December, some students pinned HV's arms behind his back and verbally taunted him; in January, another student punched HV in the face. *Id.*; R. 2548. As HV was subject to further bullying, he began to react with "explosive" anger. ECF No. 22 at 7. Following the punching incident, SD decided to keep HV out of school until she was assured by the school administration that he would be safe. R. 2549. HV missed a total of three days of school before returning to classes. R. 2550. Following his return, SD chose to have Scally spend her 1:1 instructional time helping HV catch up on work that he missed while he was out of school, rather than teach the Wilson program. R. 2550; Defendant's Brief, ECF No. 25 at 20. On

---

[1] Scally testified that the first time she spoke with SD regarding HV's drop from Wilson level 7 to level 2 was in January 2012. R. 2810. Scally further testified that SD did not seem surprised and that "[t]here was nothing about that meeting that gave me any cause for concern or if [SD] wouldn't have been happy, she didn't express it in that meeting." *Id.*

February 6, 2012, HV's English teacher, Ms. Hood, emailed SD regarding her concerns about HV's return to school. R. 2550. She wrote that she had observed changes in HV's behavior, including lots of fidgeting, refusing to open the book from which the class was reading, being generally unfocused, and making loud comments while the teacher was talking. *Id.* In his therapy sessions, HV stated that he felt like he was being blamed for his problems in school. R. 2551.

By March 2012, SD was very upset and concerned about the decline in HV's behavior at school as well as his lack of academic progress. R. 2553. On March 6, she met to discuss HV's situation with Steven Nolan, the principal of Lincoln Middle School; Suellyn Santiago, the school's Assistant Principal; Deb Mullis, HV's case manager; and Jayne Boulos, the school psychologist. *Id.* At the meeting, SD expressed her opinion that nothing the school was doing was working, noting in particular that Maryanne Scally was not helping HV, that he was not benefiting from the Wilson program, and that she did not want Scally working with HV anymore. *Id.*; R. 2870-73. She also insisted on removing HV from his English and Social Studies classes because she felt that those teachers, Gail Hood and Nancy Chard, were not meeting HV's learning style. R. 2685-86; R. 2872. SD threatened to pull HV out of Lincoln altogether unless she "saw some changes." R. 2872. The only other Wilson instructor available at Lincoln was not certified, and therefore SD refused to have that instructor work with HV. R. 2871. Deb Mullis suggested switching HV's reading instruction from the Wilson program to a different program called "System 44," a reading program similar to the Wilson program except that it was not multi-sensory.

R. 2696. Although she was somewhat skeptical, SD agreed to have HV try System 44 under the condition that he receive 1:1 instruction and because it would mean that he would no longer be working with Ms. Scally. R. 2696; R. 2554. Thus, after four years of 1:1 or small group instruction, HV ended the 12-level Wilson program in March 2012 at only level 2. ECF No. 22 at 9.

At the end of March 2012, HV began System 44. R. 2557. Initially, SD "wasn't thrilled with the environment" because HV had problems with the computer system and reported that his teacher, Ms. Krasowski, became angry with him, but by early April HV told his mother that school was going well and that he was learning again. *Id.* Nevertheless, on April 12, SD emailed Jayne Boulos to say that System 44 was "a waste." R. 1508. "Either the computer doesn't work, the teacher is out sick, the library door is locked, and on and on." *Id.*

In late April 2012, SD hired Christopher Kaufman, Ph.D., a licensed psychologist and certified school psychologist, to perform an initial consultation and diagnostic interview of HV, as well as to review HV's previous testing and to attend IEP meetings on May 16 and 30. R. 2558. Kaufman observed that HV had difficulty holding onto the progress he had made in his reading instruction, and assumed that his problems were with working memory or long-term memory. *Id.* Kaufman felt that it was very unusual for a student to regress in the Wilson program from level 7 to level 2.5, and assumed that this was due to HV's memory problems.[2] R. 2594. He

---

[2] I note that there is a minor discrepancy between the testimony of Maryanne Scally, who testified that HV was at Wilson level 2 at the beginning of the sixth grade, *see* R. 2808, and Christopher Kaufman, who testified that HV was at "level 2 or 2.5." R. 2594. This discrepancy is not significant enough to affect my analysis, however.

did not attribute HV's poor performance to a failure of the IEP or to Cynthia Johnson's instruction. *Id.*

At the May 16 IEP team meeting, Kaufman recommended that HV continue to work in a "multisensory systematic reading program." *Id.* Notwithstanding the fact that System 44 was not multisensory, the IEP team unanimously agreed to continue the System 44 program with 1:1 instruction. R. 2559. Kaufman later agreed in testimony before the administrative hearing officer that the IEP team's determination was reasonable based upon the information they had at the time. *Id.*

## C. Seventh Grade (2012-2013)

Two weeks later, on May 30, the IEP team reconvened for its annual review and to draft HV's IEP for the seventh grade. *Id.* The team agreed that the special education services for HV in the upcoming academic year would include support in various subject matters for 50 minutes per day each and a continued focus on System 44. R. 2559-60. The team also agreed to change HV's System 44 instructor at SD's request. R. 2559.

SD subsequently drafted a letter on August 21, 2012, notifying the School District that she was enrolling HV in the Aucocisco School ("Aucocisco"), a private school that focuses on students with learning disabilities, for the seventh grade and that she intended to seek reimbursement for the $29,900 tuition she paid, plus associated costs. R. 2561.

At a resolution session held on October 30, 2012, the School District offered SD another opportunity to choose from one of the three middle schools in Portland. R.

2564.  Portland also offered an amended IEP that included one 30-minute session of social work per week and one 30-minute session of social skills training per week, plus the previous special educational services offered for the seventh grade.  *Id.*  SD rejected this offer in favor of keeping HV at Aucocisco.  *Id.*

The parties participated in a special education due process hearing pursuant to 20 U.S.C. § 1415 *et. seq.* and 20-A M.R.S. § 7207-B, over four days in December 2012.  In a decision dated January 22, 2013, Hearing Officer Shari Broder, Esq. (the "hearing officer"), determined that HV had received a free, appropriate public education during his fifth grade year (2010-2011); that Portland denied HV a free, appropriate public education in the sixth grade (2011-2012) only to the extent that he received four days per week of 1:1 reading instruction rather than the required five days per week; and that Portland's IEP and placement offer for HV's seventh grade year (2012-2013) was an appropriate plan for educating HV.  R. 2581.  The hearing officer ordered Portland to pay for the cost of HV's attendance for six weeks at the Aucocisco summer academic intensive program for three hours per day, plus the costs of two hours per day of literacy tutoring for two weeks at a rate not to exceed $50.00 per hour, plus transportation costs.  *Id.*

SD filed the instant appeal on April 19, 2013.  ECF No. 1.

## II. LEGAL STANDARD

### A.    IDEA

The IDEA is a "comprehensive statutory scheme" which Congress enacted to ensure that all children with disabilities are accorded a free appropriate public

education, and that both their rights and those of their parents are protected. 20 U.S.C. § 1400(d)(1)(A)-(B); *Frazier v. Fairhaven School Committee*, 276 F.3d 52, 58 (1st Cir. 2002).

As a condition for receiving federal funds, states are required to provide a free, appropriate public education to all disabled children. *Lessard v. Wilton Lyndeborough Coop. School Dist.*, 518 F.3d 18, 23 (1st Cir. 2008). In order to provide a free, appropriate public education, a school must create and then follow an "individualized education program" ("IEP") for each disabled child. *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 34 (1st Cir. 2012). The IEP is "a written statement for each child with a disability that is developed, reviewed, and revised" in accordance with the IDEA and which must include the following: a statement of the child's present levels of academic achievement and functional performance; a statement of measureable annual goals; criteria for measuring progress toward those goals; and a statement of the specific services that the school will offer. 20 U.S.C.A. § 1414(d)(1)(A).

The Act imposes additional procedural and substantive requirements with regard to the IEP. *See Roland M. v. Concord School Comm'n*, 910 F.2d 983, 987 (1st Cir. 1990). For example, parents have the right to be part of the IEP "team" along with the teachers and other educational professionals charged with formulating a child's particular IEP. 20 U.S.C.A. § 1414(d)(1)(B); *Lessard,* 518 F.3d at 23. The purpose behind such procedural safeguards is to "guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education

and the right to seek review of any decisions they think inappropriate." *Pihl v. Massachusetts Dept. of Educ.*, 9 F.3d 184, 187 (1st Cir. 1993) (quotation omitted). Thus, in the event of a dispute between the school and the child's parents regarding the IEP, the parents have the right to demand a hearing by an impartial hearing officer. 20 U.S.C.A. § 1415(f)(1)(A), (B)(ii). A party dissatisfied with a hearing officer's decision may appeal to a state court or a federal district court, which must (i) receive the records of the administrative proceedings; (ii) hear additional evidence at the request of a party; and (iii) grant relief as it deems appropriate based upon the preponderance of the evidence. 20 U.S.C.A. § 1415(i)(2)(A), (2)(C).

A court's authority to grant relief under the Act "includes the power to order school authorities to reimburse parents for their expenditures on private school education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Pihl*, 9 F.3d at 188 (*quoting School Comm. of Town of Burlington, Mass. v. Dep't. of Educ. of Mass.*, 471 U.S. 359, 369 (1985)).

## B.     STANDARD AND SCOPE OF REVIEW

The district court reviews the hearing officer's decision based on a preponderance of the evidence standard. § 1415(i)(2)(C), *supra*; *D.B.*, 675 F.3d at 35-36. The burden of proof rests on the party challenging the hearing officer's decision. *Hampton School District v. Dobrowolski*, 976 F.2d 48, 54 (1st Cir. 1992). "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of

sound educational policy for those of the school authorities which they review." *Board of Educ. of Hendrick Hudson Central School Dist., et. al. v. Rowley*, 458 U.S. 176, 206 (1982). The requirement that a reviewing court must "receive the records of the administrative proceedings" implies that "due weight shall be given to those proceedings." *Rowley* at 206 (quotation omitted). "Judges are not trained pedagogues, and they must accord deference to the state agency's application of specialized knowledge." *Lessard*, 518 F.3d at 24 (*citing Gonzalez v. P.R. Dept. of Educ.*, 254 F.3d 350, 352 (1st Cir. 2001)) (other citations omitted). Therefore, "judicial review falls somewhere between the highly deferential clear-error standard and the non-deferential de novo standard." *Id.* (*citing Roland M.*, 910 F.2d at 989).

## C.    ADEQUACY AND APPROPRIATENESS OF THE IEP

An IDEA appeal presents two questions: the first is whether a particular school district complied with the procedures set forth in the Act, and the second is whether the IEP developed through the Act's procedures was reasonably calculated to enable the child to receive meaningful educational benefits. *Rowley*, 458 U.S. at 206-07; *D.B.*, 675 F.3d at 34-35. In this case, there does not appear to be any dispute over Portland's compliance with the IDEA's procedural requirements. Therefore, my analysis will focus on SD's substantive objection to the IEPs developed for HV in his fifth, sixth, and seventh grade years.

In *Town of Burlington v. Department of Educ. for Com. of Mass.,* 736 F.2d 773, 788 (1st Cir. 1984), the First Circuit identified certain "basic guidelines" for determining the adequacy of an IEP, among these being the "achievement of effective

results" and "demonstrable improvement in the educational and personal skills identified as special needs." The First Circuit subsequently clarified in *Roland M.* that while "actual education results are relevant to determining the efficacy of educators' policy choices," parties nevertheless should not "confuse what is *relevant* with what is *dispositive*." 910 F.2d at 991 (emphasis in original). Although "[a]ctual educational progress can (and sometimes will) demonstrate that an IEP provides a [free, appropriate public education] . . . impos[ing] the inverse of this rule–that a lack of progress necessarily betokens an IEP's inadequacy—would contradict the fundamental concept that an IEP is a snapshot, not a retrospective." *Lessard*, 518 F.3d at 29 (*quoting Roland M., 910 F.2d at 992*). "The issue is not whether the IEP was prescient enough to achieve perfect academic results, but whether it was 'reasonably calculated' to provide an 'appropriate' education as defined in federal and state law." *Roland M.* at 992.

In addition to developing an IEP that is reasonably calculated to provide meaningful educational benefits, *D.B.* at 34-35, a school district is required to implement the IEP in accordance with its requirements. *Doe ex rel. Doe v. Hampden-Wilbraham Regional School Dist.*, 715 F.Supp.2d 185, 195 (D. Mass. 2010) (*citing* 20 U.S.C. § 1401(9)(D)). Although perfect implementation is not necessarily required, courts have found that "the failure to implement a material or significant portion of the IEP can amount to a denial of [a free, appropriate public education]." *Sumter County School Dist. 17 v. Heffernan ex rel. TH*, 642 F.3d 478, 484 (4th Cir. 2011). *See*

*also Van Duyn ex rel. Van Duyn v. Baker School Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007) ("a *material* failure to implement an IEP violates IDEA.").

## D.    REMEDIES

Under the IDEA, the court has the power to "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). "[B]y empowering the court to grant 'appropriate' relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case." *Burlington,* 471 U.S. at 370; *see also Rafferty v. Cranston Public School Committee*, 315 F.3d 21, 26 (2002). "Reimbursement" is not damages, but rather payment of "expenses that [the school] should have paid all along and would have borne in the first instance had it developed a proper IEP." *Id.* at 370–71. "[C]ompensatory education is not an automatic entitlement but, rather, a discretionary remedy for nonfeasance or misfeasance in connection with a school system's obligations under the IDEA." *C.G. v. Five Town Cmty. Sch. Dist.,* 513 F.3d 279, 290 (1st Cir. 2008). A school district's responsibility for compensatory educational services does not depend on the vigilance of the parents, *see, e.g., Maine Sch. Admin. Dist. No. 35 v. Mr. R.,* 321 F.3d 9, 20 (1st Cir. 2003) (*called into doubt on other grounds by Boston Children's First v. City of Boston*, 395 F.3d 10, 15 (1st Cir. 2005)). Nor does it depend on a finding that the school district acted in bad faith or egregiously, *see, e.g., M.C. ex rel. J.C. v. Central Reg'l Sch. Dist.,* 81 F.3d 389, 397 (3d Cir. 1996). Rather, "a student who fails to receive appropriate services during any time in which he is entitled to them may be awarded compensation in the form of additional services at a later time." *Pihl,* 9 F.3d at 187.

# III. ANALYSIS

## A.     Fifth Grade (2010-2011)

The hearing officer concluded that HV's fifth grade IEP was appropriately drafted and that it "contained the essential elements of personalized instruction in the areas of need, support services, present levels of performance, measurable annual goals, methods by which progress towards those goals [could] be measured, and an explanation of the extent to which [HV] would participate with non-disabled students." R. 2571. The hearing officer also found that HV had benefitted from the IEP. R. 2572. Although she recognized that HV was not progressing as fast as his non-learning disabled peers, she nevertheless concluded that this was an understandable reflection of his complicated disability, explaining that, "[i]t is therefore no surprise that [HV] had difficulty making greater progress than he made." *Id.* She concluded that HV had received a "meaningful educational benefit" for his fifth grade year. *Id.*

SD challenges the hearing officer's conclusion and highlights three points of contention. First, SD argues that "Portland's singular reliance on the Wilson Reading Program to remediate HV's significant and complex literacy deficits was inappropriate" because "HV's evaluation results demonstrated that he had problems both with phonics *and* with visual memory, making Wilson an inappropriate choice for him at the outset." ECF No. 22 at 18 (emphasis in original). SD claims that Wilson was an "off-the-rack" programming selection which "violated the IDEA's

requirement that programming be *tailored* to meet the unique special needs" of students. *Id.* at 19 (emphasis in original).

Secondly, SD argues that the hearing officer did not address Portland's alleged failure to include programming or supports to manage HV's anxiety, and claims that this omission violated the IDEA's requirement that schools address both academic achievement and functional performance. *Id.* at 19.

Finally, SD argues that Portland failed to properly implement HV's fifth grade IEP because Cynthia Johnson admitted to allowing HV to progress in the Wilson program whenever he achieved 90% proficiency on a given level, instead of requiring him to meet 100% proficiency. *Id.* at 20-21.

The hearing officer adequately addressed each of SD's arguments in her ruling, citing evidence in the record to support her conclusions. With regard to the appropriateness of the Wilson program, she noted that "[t]here was no dispute among the various experts . . . including Dr. Kaufman, Dr. Etzweiler, and Ms. Boulos, that Wilson was an appropriate reading program for [HV's] needs." R. 2571. Insofar as HV's school-related anxiety was a problem in the fifth grade, the hearing officer noted that "[t]he assistant principal and other school officials dealt with [HV's] problems interacting with a few of his peers, and [SD] enthusiastically thanked Mr. Turner for his work. [HV's] peer problems did not appear to interfere with his learning." R. 2573. Finally, with regard to Cynthia Johnson's practice of advancing HV to the next Wilson level upon meeting 90% proficiency instead of 100% proficiency, the hearing officer noted that "Ms. Boulos observed Ms. Johnson working

with [HV] and did not report seeing anything wrong with her teaching methods," and "[t]here was no evidence that Ms. Johnson's approach to delivering [HV's] program amounted to a deprivation of [a free, appropriate public education]." R. 2572. Furthermore, the hearing officer cited Dr. Kaufman's testimony that although "[he] acknowledged that [HV] had difficulty holding onto the progress he made . . . [Kaufman] did not know what to attribute this to, other than [HV's] working memory and long-term memory problems." *Id.*

In short, the hearing officer's resolution of these issues is supported by the evidence. SD's objections, although understandable from the point of view of a concerned parent, are precisely the sort of invitation to substitute the court's own notions of sound educational policy in place of the school administrators', which the *Rowley* court explicitly warned against. *See Rowley,* 468 U.S. at 206. Accordingly, the hearing officer's ruling with regard to HV's fifth grade year is **AFFIRMED**.

**B.      Sixth Grade (2011-2012)**

In her analysis of HV's sixth grade year (2011-2012), the hearing officer focused on the problematic implementation of the IEP, noting that, while the IEP appeared to contain "the essential elements required by law," HV did not work well with his Wilson program instructor, Ms. Scally, and "made only minimal progress in reading during the sixth grade." R. 2573.

The hearing officer attributed the poor implementation of the IEP both to Portland and to SD. Apportioning some of the blame to Portland, she found fault with the School District's unilateral decision to reduce HV's 1:1 reading instruction

time to four 50-minute sessions per week, instead of the five sessions per week which were required by the IEP.  R. 2547; 2575.  She concluded that this "was certainly a factor in [HV's] slow progress" in the sixth grade and constituted a deprivation of a free, appropriate public education.  R. 2575.

The hearing officer apportioned a greater amount of blame for HV's lack of progress to SD, citing her "demanding," "blaming," and "insistent" attitude.  R. 2574. She concluded, for example, that SD "obstructed delivery of services under the IEP" by "choos[ing] to have [HV] receive half of the Wilson instruction called for in the IEP rather than drop band" at the beginning of the academic year.  R. 2574.  She also cited SD's decision in January 2012 to have HV's teacher stop work on the Wilson reading curriculum in favor of working with HV on missed schoolwork.  *Id.*  She found that SD's insistence on 1:1 instruction for HV in the Wilson and System 44 programs delayed HV from starting "and benefitting from" System 44.  *Id.*  She criticized SD for dismissing the System 44 program as a "waste of time;" found that SD pulled HV out of many classes because she did not like his teachers; and noted that SD refused to "deal with" HV's guidance counselor after the counselor suggested that HV was responsible for some of his problems with his peers.  *Id.* at 2574-75.

The hearing officer's remedy reflected her conclusion that SD shouldered more blame than the School District.  She ruled that HV was entitled to reasonable compensation from the School District for receiving only four days of individualized instruction per week instead of five.  R. 2580.  However, she limited the compensation award because "[m]uch of [HV's] lack of progress was due to [SD's] decisions, and it

does not seem fair to penalize Portland for its many efforts to try to appease [SD] by changing [HV's] program at her request. . . ." *See* R. 2580.

I disagree with the hearing officer's conclusion in two key regards. First, the hearing officer overstated SD's culpability for the ineffective implementation of HV's sixth grade IEP. Secondly, the School District's failure to provide a free, appropriate public education was a result of an inappropriately-drafted IEP, and thus extends beyond its failure to provide individualized reading instruction for a full five days per week. I discuss each issue in more detail below.

### 1. The Hearing Officer Overstated SD's Culpability

In characterizing SD as having "chosen" for HV to receive half of his allotted Wilson instruction rather than drop band, the hearing officer unfairly glossed over Portland's inability to accommodate HV's reading instruction at any time other than his scheduled band class, thereby apportioning all the blame to SD. Although the final decision may have been SD's, it was Portland that presented her with the two unsatisfactory options of either reducing HV's reading instruction or having him drop a class in which he enjoyed rare scholastic success. *See* ECF No. 22 at 6-7. Thus, the record does not support the bald conclusion that SD unilaterally "chose" to reduce HV's reading instruction by half.

Furthermore, SD's decision to allow HV to continue participating in band is reasonable when one considers the fact that she believed HV to be reading at Wilson level 7, and was unaware that Ms. Scally had determined that HV had "some holes in his knowledge" which were significant enough to drop him to level 2. R. 2546-47.

The fact that SD did not learn about this setback from Ms. Scally or another school official when it happened, but instead learned about it "a couple of months into the school year" from HV himself, R. 2630, makes SD's decision to allow HV to continue in band until late October more understandable, and casts SD's subsequent aggressive advocacy in a more reasonable light.

The hearing officer also blamed SD for her insistence on 1:1 instruction in the Wilson and System 44 programs after the March 6 IEP meeting, "even though this delayed [HV] from being in and benefitting from the System 44 program." R. 2574. However, this conclusion fails to recognize that HV's sixth grade IEP explicitly stated that "[HV] requires *individualized*, specially designed instruction to make progress on his IEP." R. 1027 (emphasis added). Thus, SD was demanding nothing that Portland was not already required to provide. The same is true regarding the criticism of SD for deciding that System 44 was a "waste of time." R. 2575. The hearing officer noted that all of SD's complaints about how the program was administered ("[either] the computer doesn't work, the teacher is out sick, the library door is locked, and on and on") were problems that "did not exist when [HV] had System 44 delivered in the group with Ms. Galli, which was the way the program would have been delivered, had [SD] not insisted it be done her way." *Id.* at n.14 (*citing* R. 499). Again, this conclusion fails to acknowledge the fact that HV's sixth grade IEP required "individualized" instruction, that SD had a good reason for raising this issue, and that she was not simply insisting on having things "her way." *See* R. 1027, *supra*.

Finally, the hearing officer's conclusion that SD's "decisions . . . were certainly a significant factor in [HV's] lack of progress during the months of September, October, February, and March," R. 2575, overstates what the weight of the evidence shows, insofar as some of SD's decisions, as discussed *supra*, were either not detrimental (insisting upon the 1:1 instruction that was already called for in the IEP), not as significant as the hearing officer suggested (referring to System 44 as a "waste of time"), or not properly characterized solely as SD's decision (choosing between reducing reading instruction or dropping music education).

## 2. Portland Failed to Provide a Free, Appropriate Public Education

In addition to providing HV with only four of the requisite five 50-minute sessions of Wilson instruction per week called for by his IEP, additional facts in the record lead me to conclude that Portland shoulders a greater degree of responsibility for HV's lack of progress in the sixth grade than the hearing officer apportioned.

HV's sixth grade IEP was drafted with the understanding that he was reading at Wilson level 7, when in fact he was reading at Wilson level 2. R. 2544. Yet Portland failed to investigate the cause for HV's decline after the beginning of the 2011-2012 academic year, when Maryanne Scally determined that HV was reading only at level 2 in the Wilson program. The evidentiary record shows that Ms. Scally told Deb Mullis about HV's precipitous drop in Wilson levels shortly after she discovered it, and duly reported that "I was going to work in level 2 and everyone seemed to be in agreement that that was fine." R. 2808. Without such an investigation, Portland was operating in the dark and did not know whether HV's decline was the result of a

failure by Cynthia Johnson, HV's fifth grade reading instructor, to follow the Wilson program; the result of HV's increased anxiety and maladaptive coping mechanisms; the result of his memory retention deficit; or the result of faulty administration of Wilson tests in arriving at a determination of his proficiency. Because HV's IEP was formulated with the assumption that he was reading at Wilson level 7, the discovery that he was actually reading at level 2 should have triggered a reevaluation of HV's sixth grade IEP. The fact that this did not happen leads me to conclude that the IEP was not properly implemented almost from the beginning of the academic year, and the failure to reconsider it in a timely manner resulted in the denial of a free, appropriate public education. *See Springfield School Committee v. Doe*, 623 F.Supp.2d 150, 161 (D. Mass. 2009) (failure to reevaluate IEP constituted denial of a free, appropriate public education). *See also Sumter County School Dist. 17,* 642 F.3d at 484. *See also Doe ex rel. Doe*, 715 F.Supp.2d at 195.

Accordingly, the hearing officer's determination that Portland provided HV with a free, appropriate public education during his sixth grade year (2011-2012) is **VACATED**. I address the proper remedy for this denial of a free, appropriate public education, *infra*.

## C.     Seventh Grade IEP (2012-2013)

The hearing officer concluded that HV could have received the programming necessary to provide him with a free, appropriate public education in the seventh grade, citing Dr. Kaufman's testimony that he could not say that Portland had fallen short on its programming obligations. R. 2576 (*citing* R. 2609). She also cited

Kaufman's testimony regarding System 44, which was the proposed focus of HV's seventh grade reading instruction. Kaufman described System 44 as a reasonable program for HV despite the fact that it was not multisensory: "many of us in this business recommend multisensory, synthetic, systematic phonics programs because they are so successful for so many kids but System 44 . . . can be very successful too in [its] own way[]. . . ." R. 2607.

SD argues that the hearing officer's conclusion should be reversed as "indefensible" because the seventh grade IEP would have provided HV with only a small-group regular education class using the System 44 program and its "de-emphasis" on individualized services. ECF No. 22 at 32. SD also asserts that the hearing officer's description of System 44 as "an evidence-based, highly structured reading program with a high degree of consistency" is misplaced. *Id.*

I conclude that the hearing officer's ruling with regard to HV's proposed seventh grade IEP is supported by the evidence, as she relies upon Dr. Kaufman's testimony to support her conclusions about System 44 and its appropriateness for HV. SD's assertions about the program, while no doubt sincerely held, simply do not have the same support in the record. Accordingly, I conclude that Portland's proposed IEP and placement offer for HV's seventh grade year (2012-2013) was an appropriate plan for educating HV. The hearing officer's decision on this point is therefore **AFFIRMED.**

**D.    Remedy**

As stated above, under the IDEA, the court has the power to "grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).  Among these remedies is "compensatory education," or the retroactive reimbursement to parents for their expenditures on private school education for a child.  *Pihl*, 9 F.3d at 188.  Such reimbursement represents a payment of expenses that the school "would have borne in the first instance had it developed a proper IEP."  *Burlington*, 471 U.S. at 370-71.

Because I vacate the hearing officer's decision with regard to HV's sixth grade year (2011-2012) and conclude that HV was denied a free, appropriate public education, I also conclude that SD is entitled to an award of compensatory education for the expenses she incurred in enrolling HV in the Aucocisco School during the 2012-2013 academic year, minus the amount the hearing officer already awarded for HV's attendance at Aucocisco's six-week summer program and for the two-week literacy tutoring and transportation costs.  R. 2581 at ¶3.

## IV. CONCLUSION

The parties shall confer and determine whether they can stipulate to the amount of the award necessary to conform with the remedy stated above.  If the amount is stipulated to, the parties shall file a joint memorandum advising the court of the award amount (i.e., the cost of HV's tuition at the Aucocisco School for the 2012-2013 academic year, minus the amount the hearing officer previously awarded), within 14 days of the date of this order.  If the parties cannot agree, each shall file a

memorandum, which shall not exceed five pages, setting forth their positions within 14 days of this order.

Additionally, the parties shall file memoranda and any accompanying affidavits addressing the potential award of attorney's fees and costs. SD shall file her memorandum and accompanying affidavits within 14 days of the date of this order. Portland's response and SD's reply, if any, shall be filed thereafter in conformance with Local Rule 7.

**SO ORDERED.**

**DATED THIS 19th DAY OF SEPTEMBER, 2014**


**_____/s/ JON D. LEVY_____**
**UNITED STATES DISTRICT JUDGE**